UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:04CV-195-H

JERRY W. DAVIS                                                          PLAINTIFF

V.

SIEMENS MEDICAL SOLUTIONS USA, INC.                                    DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Jerry Davis ("Davis"), has brought this action for additional compensation arising from his employment relationship with Siemens Medical Solutions USA, Inc. ("Siemens").  Davis says that both the written compensation agreement and the contemporaneous oral promises entitle him to $1.8 million in additional compensation and reimbursable business expenses.  He asserts state law claims for breach of contract, conversion, promissory estoppel, misrepresentation, breach of a fiduciary duty, unpaid wages and intentional infliction of emotional distress.  Both sides have moved for summary judgment.

These motions raise particularly interesting questions about Kentucky's treatment of the parol evidence rule and the doctrine of promissory estoppel as applied to an oral promise made prior to the execution of a written agreement on the same subject matter.  The Court concludes that under Kentucky law the evidence supports only Davis' claim of fraudulent misrepresentation.

I.

Siemens designs and sells health care information technology.  Davis began working for Siemens in March, 1992.  He has always been employed on an at-will basis and has held a

variety of well-paying sales and non-sales jobs.  In February of 2001, Davis assumed the role of Division Marketing Specialist III at an annual salary of $85,000.

In the fall of 2002 Siemens created several new positions identified as Product Sales Executives ("PSE").  These positions focused on various governmental accounts.  Siemens offered Davis one of these positions and confirmed the offer by a writing dated November 11, 2002.  The offer stated that Davis would receive a base compensation of $65,000 per year as well as a one year guaranteed rider in the amount of $35,000.  The offer expressly incorporated a document called the " Guarantee Rider" which, in turn, incorporated the Product Sales Executive Compensation and Commission Plan (the "Compensation Plan").  The Compensation Plan set forth the eligibility for commissions for all employees, including Davis.  On November 14, 2002, Davis confirmed acceptance of the offer letter, the Guarantee Rider and the Compensation Plan.

The Guarantee Rider explained the purpose of the "rider," the role of the commission payments and the application of the Compensation Plan:

> This rider is made a part of the Product Sales Executive Compensation and Commission Plan, which is to be used as the basic instrument for policy and procedure.  The Guarantee Rider is made available to assure a newly appointed Product Sales Executive a guaranteed minimum level of income for a limited defined period of time.  It is expected that at the end of this period, commissions for new orders generated during the period of this period will replace the requirement for guaranteed income. . . .  All commissions which would be credited and/or payable during the defined period under the standard Product Sales Executive Compensation and Commission Plan will be applied toward the total guarantee payable. . . . The Product Sales Executive shall retain all excess guarantee commission payments received during the defined period or, if applicable, until the date of transfer or termination. . . .  In the event the total of credited and/or payable commissions applied exceed the total guaranteed commissions payable during the defined period of the Guarantee Rider, the Product Sales Executive shall be entitled to full payment of such

2

excess in accordance with the "when paid" provisions of the standard Compensation and Commission Plan.

The Compensation Plan sets forth the basis for entitlement to calculating commissions for all sales executives.  Thus, by its terms, its provisions would apply to the newly created PSE's.  It contains the following pertinent provisions.

7.    To whom commission is credited and/or payable

    (a)    Commission is credited or payable to a Sales Executive who is assigned to the territory in which the equipment is to be installed.  It is necessary, to be entitled to commission, that the Sales Executive be personally and directly responsible, and have assigned such responsibility for such sale.

    (c)    National and Group Accounts, as identified in the District Office manual or other relevant announcements are Government Agencies, Companies, Associations, Chains, etc., with national buying agreements for our products, established in direct negotiation with SMS Headquarters.  In most instances, commissions on orders for these accounts are paid in accordance with the procedures stated above.  However, from time to time, such negotiations will provide a pricing agreement in the best interest of the Company which will necessitate a change in the basis of the compensation payment.  Details of such agreements and the commission structure will be distributed by Headquarters to field offices as they may occur.

VII.    Territory

The territory or accounts assigned to the Sales Executive shall be clearly defined in a letter signed

3

by the National Sales Executive.  A copy of this
letter must be forwarded to the responsible Senior
Field Executive.  Sales Executives may be
transferred from one territory to another, and the
territory assigned to a Sales Executive may be
expanded or reduced at the discretion of the
responsible National Sales Executive.  Territorial
changes must be defined in a letter signed by the
responsible National Sales Executive and a copy
must be forwarded to the responsible Senior Field
Executive.

Both parties agree that the Compensation Plan comprises the entire written agreement

concerning Davis's entitlement to commissions.  However, Davis says that two specific verbal

exchanges between himself and Siemens officials and other extrinsic evidence is relevant to his

claim for additional compensation.

Two months prior to acceptance of the written agreement, Davis says that he spoke with

Douglas Spotts ("Spotts"), the National Sales Manager in the Image Management ("IM")

Division, about the new position.  During their meeting, which took place in September of 2002

in the Breakfast Room of the Sheraton hotel in Woodbridge, New Jersey, Davis and Spotts

allegedly discussed the terms of employment, the salary and the benefits that would accompany

the job.  Spotts told Davis that he would be eligible to receive commissions for sales credited to

national and government accounts.   Because Davis knew that he would be unable to visit each

and every hospital in the United States to make individual sales, he asked Spotts whether he

would be forced to split commissions with the regional salesmen.  Spotts allegedly promised

Davis that Siemens would pay a separate, dual commission on every sale credited to national and

government accounts even though he may have no direct involvement in the sales.

Sometime after he entered into his new job, Davis realized that he was not being credited

4

with commissions for major national sales.  He learned that his name had not been entered into the commission tracking system.  He says that he asked Thomas Riesenberg ("Riesenberg"), the IM Division Vice President, what could be done to remedy the problem.  In response, Riesenberg allegedly told him that his commissions would be calculated and paid at the end of the year out of funds reserved for payment of bonuses.

Davis says that Siemens never paid the commissions due.  He now seeks to recover $1.8 million in commissions and benefits over and above his salary for the one year term of his PSE assignment.

## II.

Before addressing the merits of Davis's claims, the court must first determine whether Kentucky or New Jersey law applies to the dispute.  Both parties appear to assume that Kentucky law applies.  While the Court ultimately agrees, this is not a foregone conclusion.

A federal court sitting in a diversity action must apply the choice of law rules of the forum state.  *See Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000). Although the Compensation Plan contains a New Jersey choice of law provision, this is not necessarily determinative of the issue.  *Id*. at 392 (noting that Kentucky courts do not always honor choice of law provisions).  The Sixth Circuit has held that "in a standard breach-of-contract case . . . the Kentucky courts would choose to adopt § 187 of the Restatement (Second) of Conflict of Law (1971) as their analytical framework for addressing a contractual choice-of-law clause." *Id*. at 397.  Section 187(2) of the Restatement provides that a choice of law provision will be enforced unless either:

> (a) the chosen state has no substantial relationship to the parties or the
> transaction and there is no other reasonable basis for the parties' choice or

> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the law of § 188, would be state of the applicable law in absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Law § 187(2).

Here, New Jersey does not have a substantial relationship to the parties or the transaction between them.  Siemens, a Delaware corporation, has its principal place of business in Pennsylvania.  It conducts business across the country and seems to have no particular point of interest in New Jersey.  Davis is a resident of Kentucky and his employment was focused there. The only facts connecting New Jersey to the instant case that the court is aware of are comparatively inconsequential.  It appears that the contract was negotiated in a New Jersey hotel and that the Siemens employee who sent Davis the contract to sign worked in New Jersey. These facts alone do not establish a reasonable basis for the parties' choice of New Jersey law. In view of this analysis, the Court need not enforce the contractual choice of law provision.

In the absence of an enforceable choice of law provision, the Court will apply the "most significant relationship" test set forth in § 188 of the Restatement and adopted by Kentucky courts to determine which state's law governs.  *Breeding v. Massachusetts Indem. and Life Ins. Co.*, 633 S.W.2d 717, 719 (Ky. 1982).  Kentucky has the most significant relationship to this dispute.  As noted, Siemens is not headquartered in New Jersey and the contract was not to be performed in New Jersey.  While New Jersey may have some interest in the outcome of this litigation based on the contract's being drafted within its borders, Kentucky's interest is more significant.  Davis is a long-time resident of Kentucky and his employment was centered there. For the reasons already stated, the Court will apply Kentucky law.

III.

In Count One, Davis asserts his central claim: breach of contract.  He says that his employment contract entitles him to commissions on each and every sale of qualified equipment made during the term of his employment.[1]  The Compensation Plan governs the contractual entitlement to commissions and states two prerequisites.  First, the employee must be "assigned to the territory within which the equipment is to be installed."  Second, the employee must be "personally and directly responsible . . . for such sale."   The Court will assume that Davis was assigned to the sales territory in question because it appears to be undisputed that Davis's assigned territory was a national one. [2]  The sole remaining contractual issue is whether Davis was "directly and personally responsible" for the relevant sales within the meaning of the Compensation Plan.

The interpretation of a contract is a question of law for the court.  *Morganfield Nat'l Bank v. Damien Elder & Sons*, 836 S.W.2d 893, 895 (Ky. 1992).  In the absence of an ambiguity, Kentucky courts will enforce a written instrument strictly according to its terms and will assign those terms their ordinary meaning.  *Frear v. P.T.A. Industries, Inc.*, 103 S.W.3d 99, 106 (Ky. 2003).  Davis argues that the terms in the written agreement, "personally and directly responsible," are ambiguous.  The Court respectfully disagrees.

---

[1] The difference between the amount Davis actually received and his demand is not a mere accounting error.  Under his theory, he would be entitled to commissions and benefits of $1.8 million over and above his $65,000 base salary.

[2] The language of the Compensation Plan also provides that an employee must be "assigned . . . responsibility, for such sale."  It should be noted that another section of the Compensation Plan requires that "the territory or accounts assigned to the Sales Executive shall be clearly defined in a letter signed by the National Sales Executive."  The record does not reveal any signed letter defining Davis's territory. However, both parties stipulate that an employee who was personally and directly responsible for a sale in his/her territory was assigned responsibility for the sale as a matter of course.

A contractual term is ambiguous if it is reasonably susceptible to different or inconsistent interpretations. *Transport Ins. Co. v. Ford*, 886 S.W.2d 901, 905 (Ky. Ct. App. 1994). True, the term "personally and directly responsible" may not be a precise term of art. Nevertheless, its meaning is not reasonably susceptible to different or inconsistent interpretations. Each term is subject to clear definition. Random House defines "responsible" as "chargeable with being the author, cause, or occasion of something" and as "answerable or accountable." Random House Unabridged Dictionary (2d ed. 1993). It defines "directly" as "in a direct line, way or manner" and it defines "personally" as "through direct contact; in person; directly." Id. Moreover, as used together, those meanings reinforce one another. They require direct and unmediated involvement in the actual product sale. The Court finds that as a general matter, the term "personally and directly responsible" is absolutely clear and unambiguous.

Davis asks the court to consider additional evidence to determine what the parties meant by "personally and directly responsible." More specifically, he asks the Court to consider three factual assertions extrinsic to the written agreement: (1) Siemens routinely paid other salesmen dual commissions; (2) his supervisor indicated that Davis would earn dual commissions in a telephone conference with a group of regional salesmen; and (3) his supervisor assured him that he would be paid commissions at the end of the year. This post-contract extrinsic evidence does not implicate the parole evidence rule. Under Kentucky law, however, the Court cannot reference extrinsic facts or aids, to determine the meaning of an unambiguous contract. *Frear*, 103 S.W.3d at 106; 11 Richard A. Lord, *Williston on Contracts* § 30:6 (4th ed.).

Even a clear and unambiguous provision can be difficult to apply in a given circumstance. That is not true here, however. Davis admits that he had no direct involvement in

the actual sale of goods during his employment as the National PSE.  He supervised salespeople

and he put them in a position to make sales; but he did not make any sales himself.  Indeed,

Davis does not seem to make a serious argument that he qualifies for commissions under any

generally accepted definition of the contract terms.  Indeed, no conceivable definition of the

terms would entitle Davis to compensation in one circumstance.  As applied here, the

interpretation of the Compensation Plan is not subject to serious dispute.

IV.

As an alternative means of enforcing his view of the Compensation Plan, Davis presents

statements made prior to the execution of the written agreement suggesting that Siemens actually

meant to pay an override commission on all national and government sales.  Specifically, Davis

alleges that in September of 2002, two months before he entered into the written agreement,

Spotts promised him a dual commission scheme.

To succeed Davis must somehow avoid the imperatives of the parole evidence rule.  *See,*

*e.g.*, *Luttrell v. Cooper Industries, Inc.*, 60 F. Supp. 2d 629, 631 (E.D. Ky. 1998); *M.R.*

*Kopmeyer Co. v. Barnes*, 276 S.W.2d 21, 23-24 (Ky. 1955) (defining parol evidence as "a

contemporaneous oral agreement on the same subject matter" as a governing written agreement).

Generally, the parol evidence rule bars evidence of oral statements or writings made prior to or

contemporaneous with a written agreement that contradict, vary or alter the language appearing

in the writing.  *Luttrel*, 60 F. Supp. at 631;  *Johnson v. Dalton*,  318 S.W.2d 415, 417 (Ky. 1958).

 The rule is intended to preserve the integrity of written agreements.  *O. P. Link Handle Co. v.*

*Wright*, 429 S.W.2d 842, 847 (Ky. 1968).

Davis argues that Spotts's oral promise merely serves to clarify the agreement and that

9

therefore the parol evidence rule does not bar its admission.  To be sure, statements of the parties are admissible whenever necessary to interpret ambiguous contract language.  *See, e.g.*, *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.,* 94 S.W.3d 381, 385 (Ky. Ct. App. 2002); *Reynolds Metals Co. v. Barker*, 256 S.W.2d 17, 18 (Ky. 1953).  But for the exception to apply, ambiguity must be apparent on the face of the instrument itself.  *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky. 2000).  In other words, one cannot use parol evidence to create ambiguity in an otherwise unambiguous document.  As the Court has explained above, the term  "personally and directly responsible" is unambiguous on its face.  Therefore, under the parol evidence rule, the Court may not consider Spotts's alleged statement as clarification of an unambiguous term.

Alternatively, Davis argues that the Spotts's alleged oral statement meets a second exception to the parol evidence rule.  Extrinsic evidence may add terms to an incomplete agreement where the written agreement constitutes only a "partial integration" of the parties' entire agreement.  *Kovacs v. Freeman*, 957 S.W.2d 251, 257 (Ky. 1997); *Bullock v. Young*, 67 S.W.2d 941, 946 (Ky. 1933).[3]  For extrinsic evidence to be admissible under this exception requires two showings: (1) the written agreement is only a partial integration of the parties' actual agreement; and (2) the proffered additional term is consistent with the language contained in the writing.  *See Ford v. Hurt*, 265 S.W.2d 475, 477 (Ky. 1954); *Citizens Nat. Bank of Glasgow v. Damron*,  149 S.W.2d 762, 765 (Ky. App. 1941) ("[I]t is incompetent to defeat a

---

[3] A writing is a "partial integration" of an agreement where the writing is incomplete and is "adopted by the parties as the expression of that portion of their larger parol agreement to which it relates."  11 Richard A. Lord, *Williston on Contracts* § 33:20 (4th ed.).  To determine whether a writing is a complete or partial integration, a court must engage in a fact-specific analysis.  The question is whether the parties intended for the terms recorded in the writing to be their entire agreement.  11 Richard A. Lord, *Williston on Contracts* § 33:15 (4th ed.); *Bullock v. Young*, 67 S.W.2d 941, 946 (Ky. 1933).  In the present case, the Court need not determine whether the Compensation Plan is a partial integration because the Court finds the exception inapplicable on other grounds.

positive unqualified writing or written promise, by proving a contemporaneous agreement in direct contradiction of the terms of the writing.").  For obvious reasons, this exception is inapplicable here.  Even if Davis can show that the Compensation Plan is only a partial integration of the terms of the actual agreement, the Court may not consider Spotts's oral statement.  Davis claims that Spotts assured him that he would receive commissions on any sale made in the continental United States even if he were not directly involved in its making.  This alleged statement directly contradicts the Compensation Plan's language requiring direct and personal responsibility for entitlement to sales commissions.[4]

Finally, Davis cites *Texas Gas Transmission Corp. v. Kinslow*, 461 S.W.2d 69 (Ky. 1970), as the basis for yet another exception to the parol evidence rule.  In *Texas Gas*, the Kentucky Supreme Court held that in the absence of a recital of consideration which the parties intend to be contractual, parol evidence is admissible to show the true consideration for the contract.  *Id*. at 71; see also Ky. Rev. Stat. § 371.030 ("The consideration of any writing, with or without seal, may be impeached or denied by pleading.").  Davis argues that the Compensation Plan was a mere recital of consideration and that the "true consideration" for his employment contract was Spotts's promise to pay him an override commission for every national and governmental sale.  For the following reasons, the Court concludes that *Texas Gas* does not

---

[4] The non-existence of an actual integration clause within the Compensation Plan is not a dispositive or even a relevant factor under these circumstances.  An integration clause, which typically states that there are no representations, promises or agreements between the parties except those found in the writing, is only relevant to the question of integration.  *See KFC Corp. v. Darsam Corp.*, 543 F. Supp. 222, 225 (D.C. Ky. 1982).  Because the Compensation Plan did not contain an integration clause, in theory it could represent only a partial integration of the actual agreement between Siemens and Davis.  However, to introduce evidence of additional terms, those additional terms must be consistent with the written agreement.  *Ford* 265 S.W.2d at 477.  The term that Davis has proffered–that he is entitled to commissions on every sale booked in national and governmental accounts–directly contradicts the plain and unambiguous meaning of the written agreement.

11

decide this case.

In *Texas Gas*, the consideration recorded in the writing was of a nominal nature and open to question and investigation.[5]  Key matters of compensation were omitted or unknown at the time of the execution of the written agreement.  Thus, our case is materially distinguishable. First, the consideration provided for in Davis's written agreement is both substantial and determinable, rather than nominal and open to question.  The agreement provides that in consideration for Davis's employment, Siemens will pay him an $65,000 base salary. a $35,000 guaranteed rider, and the payment of commissions on all sales for which he was personally and directly responsible.  Even more important, unlike *Texas Gas*, neither the Compensation Plan nor any other writing indicates that the parties did not intend for the consideration recited in the Compensation Plan to be contractual and conclusive.

For all these reasons, the Court finds no basis upon which Davis might succeed on his breach of contract claim.

V.

As an alternative to his contract claim, Davis asserts promissory estoppel.  Davis has two factual grounds for that claim.  First, he alleges that before he entered into the written agreement, Spotts, his supervisor, orally promised to pay him an override commission on all national and

---

[5]The dispute in *Texas Gas* involved the plaintiffs' grant of a right of way to a gas company executed so that the company could lay a gas pipeline across the farmers' land.  *Texas Gas*, 461 S.W.2d at 70.  The plaintiffs and the gas company executed two written agreements, each containing a recital of nominal consideration.  *Id*.  One agreement contained a handwritten proviso stating that "'The above consideration dose [sic] not include any damage that might occur to a spring near the R/W.'"  *Id*.  Subsequent to the execution of the agreement, the gas company caused $7500 worth of damage to the farmers' spring.  *Id*.  The farmers sued to recover and the gas company argued that it had no contractual duty to pay the damages.  *Id*.  At trial, the farmers alleged that prior to the execution of the agreements, the gas company had made an oral promise to protect their spring and to pay any damages to it caused by the laying of he pipe.  *Id*.  Because the "Damages Release" expressly stated that the recital of consideration did not fully encompass the scope of the agreement, the court found that the recital of consideration was not contractual.  *Id*. at 71.  Therefore, the court held that evidence of the true consideration was admissible.  Id.

12

international sales.  Second, he alleges that after he entered into the agreement, Mr. Riesenberg,

another supervisor, promised him he would receive his commissions at the end of the year.

According to Davis, he detrimentally relied on each of the promises because he accepted

Siemens's offer of employment and continued to work there even after Siemens failed to pay

him the commissions.

After reviewing the more recent relevant Kentucky cases, the Court concludes that a

claim of promissory estoppel requires proof of the following elements: (1) a promise; (2) the

promisee reasonably relies upon the promise by acting or forbearing to act upon the strength of

it; (3) the promisor, at the time of making his promise, foresees or expects that the promisee

would act or forbear in reliance upon it; and (4) enforcement of the promise is necessary to avoid

an injustice.  See Restatement (Second) of Contracts § 90(1) (1979); *Meade Const. Co., Inc. v.

Mansfield Commercial Elec., Inc.*, Ky., 579 S.W.2d 105, 106 (Ky. 1979); *Lichtefeld-Massaro,

Inc. v. R. J. Manteuffel Co., Inc.*, 806 S.W.2d 42, 44 (Ky. Ct. App. 1991);  *Rivermont Inn, Inc. v.

Bass Hotels Resorts, Inc.*, 113 S.W.3d 636, 642 (Ky. Ct. App. 2003); *Res-Care, Inc. v. Omega

Healthcare Investors, Inc.*, 187 F. Supp. 2d 714, 718 (W.D. Ky. 2001); *Monumental Life

Insurance Co. v. Nationwide Retirement Solutions, Inc.*, 242 F. Supp. 2d 438, 451 (W.D. Ky.

2003); *Bergman v. Baptist Healthcare System, Inc.*, 344 F. Supp. 2d 998, 1003 (W.D. Ky. 2004).

It is tempting to view promissory estoppel as merely an alternative to a standard breach

of contract claim.  That is certainly not the traditional view of the doctrine, however.

"Historically, the doctrine of promissory estoppel traces its roots primarily to four or five

principal categories of promises,"  all of which were gratuitous in nature: (1) promises by

gratuitous bailees; (2) promises to make charitable donations; (3) promises made by one family member to another; (4) gratuitous promises for the conveyance of land; and (5) gratuitous promises regarding family settlements.  4 Richard A. Lord, *Williston on Contracts* § 8:6 (4th ed.).  When the doctrine first came into being, courts universally held that promissory estoppel was not to be used as a substitute for consideration when a commercial bargain was contemplated.  *See, e.g.*, *School District v. Sheidley*, 40 S.W. 656 (Mo. 1897); *Heisley v. Eastman*, 201 P. 872, 879 (Or. 1921).

In one leading case, *James Baird Co v. Gimbel Brothers*, 64 F.2d 344 (2d Cir. 1933), Judge Learned Hand refused to apply the doctrine of promissory estoppel to enforce a subcontractor's bid because it was part of an arms' length commercial exchange.  *Id*. at 346.  In describing the doctrine of promissory estoppel, Judge Hand wrote:

> Offers are ordinarily made in exchange for a consideration, either a counter-promise or some other act which the promisor wishes to secure. . . . But a man may make a promise without expecting an equivalent; a donative promise, conditional or absolute. . . . The doctrine of "promissory estoppel" is to avoid the harsh results of allowing the promisor in such a case to repudiate, when the promisee has acted in reliance upon the promise. . . . But an offer for an exchange is not meant to become a promise until a consideration has been received, either a counter-promise or whatever else is stipulated. To extend it would be to hold the offeror regardless of the stipulated condition of his offer.

*Id*. (citations omitted).

Likewise, the earliest Kentucky cases recognizing the doctrine of promissory estoppel viewed the doctrine as separate and apart from contractual, commercial bargains.  This Court can find only three occasions between 1911 and 1967 where Kentucky courts applied the doctrine of promissory estoppel and each occasion involved the promise of a charitable donation unsupported by consideration.  *Lake Bluff Orphanage v. Magill's Ex'rs*, 204 S.W.2d 224, 226 (Ky. 1947) (finding the doctrine of promissory estoppel applicable to a pledge by a private donor

14

to an orphanage); *Transylvania Univ. v. Rees*, 179 S.W.2d 890, 892 (Ky. 1944) (finding insufficient detrimental reliance on the part of a private university to require the court to enforce a private donor's gratuitous pledge); *Floyd v. Christian Church Widows & Orphans Home*, 176 S.W.2d 125, 130-31 (Ky. 1943) (holding that promissory estoppel could make a charitable pledge enforceable even if it is not supported by consideration).

More recently, outside this jurisdiction, the interplay between promissory estoppel and a bargained-for exchange has blurred.  Some courts have extended promissory estoppel to promises otherwise unenforceable under traditional contract doctrine.  *See, e.g.*, *Palermo v. Warden, Green Haven State Prison*, 545 F.2d 286 (2d Cir. 1976) (suggesting the applicability of estoppel to a negotiated plea bargain alleged to be unenforceable due to its illegality).  Thus, some courts have expanded the doctrine to embrace promises which were too indefinite to support a contract, *see, e.g.*, *Doll v. Grand Union Co.*, 925 F.2d 1363 (11th Cir. 1991), and promises which are illusory.  *See, e.g.*, *First Nat. Bank of Logansport v. Logan Mfg. Co., Inc.*, 577 N.E.2d 949 (Ind. 1991).  In fact, the doctrine has even been applied to enable partial enforcement of promises made when the resulting contract, if it had been entered into, would have been terminable at will.  4 *Williston on Contracts* § 8:6 (4th ed.) (citing Restatement (Second) of Contracts § 90, comment d, illustration 8).

Other courts held to the more traditional approach, concluding that the doctrine applies only when no contract exists, oral or otherwise.  *See, e.g.*, *Frost Construction Co. v. Lobo, Inc.*, 951 P.2d 390, 397 (Wyo. 1998) ("Since promissory estoppel applies only if a contract does not exist, a promissory estoppel argument in this case, where the evidence demonstrates the existence of a contract, is incongruous."); *Walker v. KFC Crop.*, 728 F.2d 1215, 1220 (9th Cir.

1984); *Spensley Feeds, Inc. v. Livingston Feed & Lumber, Inc.*, 381 N.W.2d 601, 607 n. 8 (Wis. 1985); *Tuomala v. Regent University*, 477 S.E.2d 501, 506 (Va. 1996).

Kentucky's state courts have given little guidance about the current scope of promissory estoppel. *See* Eric Mills Holmes, *Restatement of Promissory Estoppel*, 32 Willamette L. Rev. 263, 384 (1996) ("There is a paucity of Kentucky promissory estoppel cases."). One consequence of this relative inattention is that Kentucky courts have never ruled that the doctrine applies *exclusively* to gratuitous promises or that promissory estoppel is inapplicable to contractual arrangements. More important, however, our courts have not suggested an intent to extend the scope of promissory estoppel. Kentucky courts have consistently held that promissory estoppel applies to gratuitous promises, unsupported by consideration. *See e.g.*, *McCarthy v. Louisville Cartage Co., Inc.*, 796 S.W.2d 10, 12 (Ky. App. 1990) ("The whole theory of a promissory estoppel action is that detrimental reliance becomes a substitute for consideration under the facts of a given case.")[6]; *Lichtefeld-Massaro, Inc.*, 806 S.W.2d at 43-44 (holding that promissory estoppel made a subcontractor's bid an enforceable promise even though the general contractor was not mutually bound to accept the bid at the time it was made). They have also suggested that promissory estoppel is fundamentally different from a contract. *See McCarthy*, 796 S.W.2d at 12 (promissory estoppel "is not founded upon a legal duty and a breach thereof; but rather, it is based upon a mere promise and reliance on that promise").

In sum, Kentucky courts seem to have so far narrowly confined their use of the doctrine

---

[6]It should be noted that the *McCarthy* opinion appears to have conflated the elements of promissory estoppel and equitable estoppel. Nevertheless, *McCarthy* was certainly a promissory estoppel case. Indeed, the Kentucky Supreme Court and various federal courts have cited *McCarthy* as part of its adherence to the doctrine of promissory estoppel. *See, e.g.*, *United Parcel Service Co. v. Rickert*, 996 S.W.2d 464, 470 (Ky. 1999); *FS Invs., Inc. v. Asset Guar. Ins. Co.*, 196 F. Supp. 2d 491, 506-507 (E.D. Ky. 2002).

and, in doing so, have suggested that promissory estoppel is fundamentally different from a contract.  With this in mind, the Court will consider each of Davis's claims in turn.

A.

The Court first addresses Davis's claim that he detrimentally relied on Spotts's alleged oral promise to pay him override commissions.  As discussed above, the parol evidence rule would bar the use of the Spotts's statement to establish breach of contract.  At issue here then is whether a party may assert a promissory estoppel claim based on an oral promise that is otherwise barred by the parol evidence rule.  No Kentucky state court has directly addressed this issue.[7]  Accordingly, this Court must "ascertain from all available data . . . what the state's highest court would decide if faced with the issue."  *Grantham and Mann, Inc. v. American Safety Products, Inc.*, 831 F.2d 596, 608 (6th Cir. 1987).  To do so, the Court will examine decisions and rationales from other jurisdictions that have decided this specific issue, general Kentucky law, and policy considerations for guidance in determining how the Kentucky Supreme Court would likely decide this issue.

The majority of courts in other jurisdictions has held that a prior inconsistent oral promise cannot be the basis of a promissory estoppel claim.  *Durkee v. Goodyear Tire & Rubber Co.*, 676 F. Supp. 189, 192 (W.D. Wis. 1987) ("To entertain a theory of recovery that makes a prior, inconsistent promise enforceable is to write the [parol evidence] rule out of existence.");

---

[7] For this Court's purposes, the issue at hand is of first impression for Kentucky state courts.  Siemens cites *Tractor and Farm Supply, Inc. v. Ford New Holland, Inc.*, 898 F. Supp. 1998 (W.D. Ky. 1995) as support for the proposition that Davis's promissory estoppel claim is precluded by Kentucky law.  In *Tractor Farm*, this Court held that under Kentucky law, "estoppel cannot be the basis for a claim if it represents the same performance contemplated under a written contract." *Id.* at 1205. While the foregoing analysis eventually reaches the conclusion that Kentucky courts would so hold, no Kentucky court has in fact specifically decided the issue.  In *Tractor Farm*, this Court relied on *General Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.3d 1038, 1042 (6th Cir. 1984), a Sixth Circuit decision.  However, in that case the Sixth Circuit applied Michigan law.

17

*All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 869-70 (7th Cir. 1999)*; Davis v. University of Montevallo*, 638 So.2d 754, 758 (Ala. 1994); *Big G Corp. v. Henry*, 536 A.2d 559, 562 (Vt. 1987); *Johnson v. Curran*, 633 P.2d 994, 996-97 (Alaska 1981); *Prentice v. UDC Advisory Services, Inc.*, 648 N.E.2d 146, 152-53 (Ill. App. 1995).

The Seventh Circuit case, *All-Tech Telecom*, provides a well-reasoned explanation of the majority rule.  There, Judge Richard Posner found the doctrine of promissory estoppel inapplicable to a series of oral promises made during the course of negotiations and during the course of the performance of a written agreement.  *All-Tech Telecom*, 174 F.3d at 869-70.[8]  The Seventh Circuit affirmed the dismissal of the promissory estoppel claim holding that a "promisee cannot be permitted to use the doctrine to do an end run . . . around the parol evidence rule."  *Id.* at 869.  Judge Posner reasoned that where a written contract governs the relationship between the parties, promissory estoppel is a duplicative remedy:

> Promissory estoppel is meant for cases in which a promise, not being supported by consideration, would be unenforceable under conventional principles of contract law.  When there is an express contract governing the relationship out of which the promise emerged, and no issue of consideration, there is no gap in the remedial system for promissory estoppel to fill.  To allow it to be invoked becomes in those circumstances gratuitous duplication or, worse, circumvention of carefully designed rules of contract law.  *Id.* (citations omitted).

Because the parties' contract covered the relationship within the scope of the alleged warranty, the court found no reason "for using the doctrine of promissory estoppel to resuscitate it."  *Id.*

---

[8] In *All-Tech Telecom*, the defendant, Amway, offered to its distributors a credit-card operated telephone system called TeleCharge for sale to restaurants and hotels.  *Id.* at 864.  All-Tech, an Amway distributor, entered into a written agreement with Amway to purchase a large number of the phones.  *Id.*  All-Tech claimed to have been lured into the unsuccessful venture by a series of oral misrepresentations, including a promise that Amway had conducted extensive research regarding the success of the telephones.  None of the warranties was included in the written terms of the agreement.  *Id.*  All-Tech filed, *inter alia*, a promissory estoppel claim based on these alleged oral misrepresentations.  *Id.*

Thus, the general rationale for the majority rule is that the written agreements supercede and incorporate all prior oral statements on subjects covered by the written agreement.  The Seventh Circuit's interpretation of promissory estoppel is consistent with the more limited scope of the doctrine apparent from a full review of Kentucky cases.  To hold otherwise, makes the formalities of a written contract meaningless.

The Kentucky courts have also been reluctant to contravene the technical requirements of contract law.  In *Rivermont Inn, Inc.,* Kentucky's most recent and most thorough explanation of the doctrine of promissory estoppel, the Court of Appeals held that promissory estoppel could not be applied to defeat the statute of frauds under the particular circumstances involved. *Rivermont Inn, Inc.*, 113 S.W.3d at 643.  *Rivermont* is a different case from ours in many respects.[9]  Its significance, however, is that the Kentucky Court of Appeals was not inclined to allow the doctrine of promissory estoppel as means of avoiding rules of contract interpretation and compliance.  *See id.* at 642 (noting that detrimental reliance on an oral promise is "not sufficient to defeat the statute of frauds").[10]

The overarching principle suggested in *Rivermont Inn, Inc.* applies just as clearly to the common law parole evidence rule as it does to the statute of frauds.  Kentucky views the parol evidence rule as a firm and well-established rule of law.  The rule dates back to at least the mid-

---

[9] In *Rivermont*, a hotel and resort company claimed that a representative of the Holiday Inn Franchise Administration orally promised to approve its application for a license to open a local franchise.  *Id.* at 639.  The court noted that if the alleged conversation constituted an oral contract, it would be unenforceable under the statute of frauds because the franchise relationship was to last five years.  *Id.* at 642.  In the instant case, the statute of frauds provides no bar to the enforceability of Spotts's alleged oral promise.

[10] The Court of Appeals did not hold that promissory estoppel could never be used to defeat a statute of frauds defense.  Instead, after noting initially that detrimental reliance on an oral promise is "not sufficient to defeat the statute of frauds," the court held that the plaintiff had failed to prove that its detrimental reliance was reasonable because the written agreement expressly provided that oral promises would not be binding.  *Id.* at 642.

19th-century.  *See, e.g.*, *Park v. Price*, 1 Ky. Op. 17 (1866) ("It is a well-settled principle that parol evidence is not admissible to vary the terms or import of a writing . . . .").  Since then it has been interpreted as "more than a rule of evidence . . . .  It is one of substantive law."  *Gibson v. Sellars*  252 S.W.2d 911, 913 (Ky. 1952).  To allow oral promises otherwise inadmissible under the parol evidence rule to form the basis of a promissory estoppel claim would eviscerate the rule and disregard at least 140 years of jurisprudence.

Accordingly this Court finds that an oral promise made prior to the execution of a written agreement that is inconsistent with the unambiguous terms of the written agreement cannot form the basis of a promissory estoppel claim.  As applied to the instant case, Davis is precluded from asserting promissory estoppel as a grounds for relief.

B.

Next Davis argues that he is entitled to relief under promissory estoppel because a few months after he signed the Compensation Plan, his supervisor, Mr. Riesenberg, assured him that he would receive his commissions at the end of the year.  Davis alleges that after he took the National and Governmental Sales position, he complained to Riesenberg that the computer program used to calculate commissions was not formulated to pay him his override commission.  Riesenberg allegedly reassured Davis that his commissions would be calculated and paid at the end of the year out of a stipend fund.  Davis argues that Riesenberg's reassurance constituted a promise and that he detrimentally relied on it by continuing to work for Siemens.

Here, the alleged promise was made after the execution of the written agreement. Davis's reliance on it, therefore, would not circumvent the parol evidence rule.  Thus, notwithstanding the Court's analysis above, his allegation could constitute a viable claim of promissory estoppel

provided that he properly asserted the *prima facie* elements.  However, the Court finds that Davis cannot make a *prima facie* case.

Taken alone, Riesenberg's offhand, ministerial statement is not a promise.  See Restatement (Second) of Contracts § 2 (defining a promise as a "manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made").  To be sure, the fact that Riesenberg reassured Davis that he would be paid at the end of the year could be construed as a reaffirmation of Spotts's original promise to pay him override commissions.  Indeed, the statement arguably corroborates the fact that the original promise was made.  However, it is not an independent enforceable promise on its own.  Therefore, no reasonable juror could find that Davis is entitled to recover on the basis of promissory estoppel.

## VI.

Davis also asserts a claim for misrepresentation based on the statements of Douglas Spotts in September of 2002 during a meeting at the Sheraton Hotel in Woodbridge, New Jersey.  To state such a claim, Davis must allege: (1) that Siemens made a false statement; (2) regarding a material fact; (3) that Siemens knew the statement to be false or acted recklessly as to its truth or falsity; (4) that Siemens intended to deceive Davis; (5) that Davis reasonably relied upon the deception; and (6) that Davis suffered damages as a result.  *United Parcel Service Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999); *Res-Care, Inc. v. Omega Healthcare Investors, Inc.*, 187 F. Supp. 2d 714, 717 (W.D. Ky. 2001); *Hunt Enterprises, Inc. v. John Deere Indus. Equipment Co.*, 18 F. Supp. 2d 697, 702 (W.D. Ky. 1997).

As previously discussed, during that meeting, Spotts told Davis that in he would receive

an override commission on all national and governmental sales regardless of his personal involvement in the actual sales.  Davis argues that this alleged promise was a material misrepresentation of fact that Spotts knew to be false.  Davis further alleges that he relied on the statement, as Spotts intended, when he accepted the offer of employment.  A misrepresentation claim is considerably more difficult to prove than promissory estoppel because it requires evidence of knowing deception or fraud.  Nevertheless, Davis appears to meet the bare minimum for a *prima facie* case of misrepresentation.

Under Kentucky law, representations as to future conduct will not support a fraud claim. *See, e.g.*, *Res-Care, Inc. v. Omega Healthcare Investors, Inc.*, 187 F. Supp. 2d 714, 717 (W.D. Ky. 2001); *Schroerlucke v. Hall*, 249 S.W.2d 130, 131 (Ky.1952); *Moseley v. Owensboro Municipal Housing Commission*, 252 S.W.2d 880, 881 (Ky.1952).  However, a statement as to future conduct may form the basis for a misrepresentation claim if made with the intent to induce the other party to enter into a contract.  *See Evola Realty Co. v. Westerfield*, 251 S.W.2d 298, 300-01 (Ky.1952); *Schroerlucke*, 249 S.W.2d at 131.  That appears to be an inference available from our facts.  Davis has alleged that Siemens promised to pay him commissions with the knowledge that it would never pay him so as to induce Davis into accepting the offer of employment.  This allegation is sufficient to state a claim for fraud against Siemens.[11]

Siemens also argues that the economic loss doctrine bars Davis's misrepresentation claim.  Citing *Ohio Casualty Ins. Co. v. Vermeer Mfg. Co.*, 298 F. Supp. 2d 575 (W.D. Ky. 2004), Siemens argues that because Davis's misrepresentation claim is inseparable from his

---

[11] It should be noted that Davis has moved for summary judgment on his misrepresentation claim as well. However, because Siemens alleges that Spotts never made the alleged statement regarding Davis's entitlement to commissions; there is a genuine issue of material fact.  Therefore, summary judgment is inappropriate.

contractual claims, Davis's exclusive remedy is breach of contract.  There is some support for this proposition.  *See, e.g.*, *R.A.M. Sourcing Agency, Inc. v. Seaboard Marine, Ltd.*, 995 F. Supp. 1465, 1467 (S.D. Fla.1997) (a party may not raise tort claims to recover solely economic losses arising from a breach of contract unless there is evidence of physical injury or damage to other property); *Heller Fin., Inc. v. Grammco Computer Sales, Inc.*, 71 F.3d 518, 527-28 (5th Cir. 1996) (tort damages are not recoverable for a fraudulent inducement claim unless the plaintiff suffers an injury that is distinct, separate, and independent from the economic losses recoverable under a breach of contract claim).

However, to date, no Kentucky court has held that the economic loss rule applies so expansively.  Instead the economic loss rule has been limited to apply to products liability cases, *see, e.g.*, *Ohio Casualty Ins. Co.*, 298 F. Supp. 2d at 577-78, to business purchases, *see, e.g.*, *Mt. Lebanon Personal Care Home Inc. v. Hoover Universal Inc.*, 276 F.3d 845, 849 (6th Cir. 2002), and to construction cases, *see, e.g.*, *Bowling Green Municipal Utilities v. Thomasson Lumber Co.*, 902 F. Supp. 134 (W.D. Ky. 1995).  To expand the rule so as to bar a fraudulent inducement claim in an employment contract without further guidance from the Kentucky courts would eviscerate the claim of fraudulent inducement and would contravene contrary Kentucky case law.  *See, e.g.*, *Hanson v. American Nat'l Bank & Trust Co.*, 865 S.W.2d 302, 309 (Ky. 1993) ("The idea that any person or industry or enterprise would be immune from liability for fraud and deceit is not acceptable.").

Therefore, a reasonable juror could find that Davis is entitled to recover based on his misrepresentation claim.

VII.

23

Davis also asserts claims for conversion, misrepresentation, breach of fiduciary duty and for violation of Kentucky's wage statute.  The claims are more easily resolved as follows.

A.

Siemens argues that Davis's conversion claim cannot succeed because he had no ownership rights in any particular property.  Davis says that he may pursue the conversion claim at the same time as his contract claim irrespective of the similarity of the remedies.

The elements of a conversion claim are (1) ownership rights in a certain property, (2) the wrongful act of taking or disposing of property, and (3) causing damages.  *Anderson v. Pine South Capital, LCC*, 177 F. Supp. 2d 591, 603 (W.D. Ky. 2001); *Goss v. Bisset*,  411 S.W.2d 50, 53 (Ky. 1967).  A conversion claim and contract claims are not always incompatible.  Here, however, the conversion claim does not lie because the property right alleged to have been converted arises entirely from the contractual rights to compensation.  In reality, Davis seeks payment of a disputed debt, not payment for the conversion of a specific asset or a specific property right.  The interpretation of the contract governs Davis's entitlement to the disputed payments.

B.

Siemens argues that Davis's claim for breach of fiduciary duty simply does not apply in these circumstances.  A fiduciary relationship is one "founded on trust or confidence reposed by one person in the integrity and fidelity of another," and that relationship must involve "an undertaking in which a duty is created in one person to act *primarily for another's benefit*." *Monumental Life Ins. Co. v. Nationwide Retirement Solutions, Inc.*, *supra* (emphasis added) (*quoting Steelvest Inc.v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991); *Auto*

24

*Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 793 (W.D. Ky. 2001).  Davis

has offered no evidence that Siemens had a duty to act primarily for Davis's benefit no is there

evidence that Siemens and Davis were involved in a "joint venture."  *See Greenup v. Hewitt*, 235

S.W.2d 1000, 1002 (Ky. 1951).  Davis was a salaried employee who under certain circumstances

was entitled to receive commissions.  This does not constitute a joint venture.  Under the

evidence here, the Court concludes that Siemens did not assume fiduciary duties with respect to

its employment relationship.

C.

Siemens argues that Davis's wage claim under KRS 337.385 fails because the claim is

one not covered by the statute and in any event, Davis did not pursue his necessary

administrative remedies before initiating his lawsuit.  The Court agrees.

Davis has not satisfied his administrative prerequisites.  Section 337 bars proceeding to a

civil lawsuit until the Labor Commissioner has conducted his own proceeding.  *McMichael v.*

*Falls City Towing Co.*, 199 F. Supp. 2d 632, 637 (W.D. Ky. 2002).  Thus, claims brought

pursuant to KRS 337.385 must first be raised before the Labor Cabinet to resolve questions of

fact.  Davis has failed to comply with this requirement and, therefore, cannot avail himself of the

benefits of KRS 337.385.

VIII.

Siemens argues that Davis's potential infliction of emotional distress claim must be dismissed because its conduct was not outrageous and did not cause severe emotional distress to Davis.  To make such a claim, one must prove the following elements: (1) conduct that is intentional and reckless; (2) conduct that is so outrageous and intolerable that it offends generally accepted standards of decency and morality; (3) a causal connection between the alleged wrongful conduct and the emotional distress; and (4) severe emotional distress.  *Gilbert v. Barkes*, Ky., 987 S.W.2d 772, 777 (1999); *Pennington v. Dollar Tree Stores, Inc.*, 104 F. Supp.2d 710, 715 (E.D. Ky. 2000).

Davis's claim is based almost entirely upon Mr. Riesenberg's actions and statements.  He says that Riesenberg verbally abused him with foul language; that he filled out unfavorable appraisal sheets; that he blocked his right to health care; all for the purpose of driving Davis from the company.  Although such conduct may be offensive, it is not so outrageous and intolerable that it offends generally accepted standards of decency and morality.  Therefore, summary judgment is appropriate.

The Court will enter an order consistent with this Memorandum Opinion.

cc:     Counsel of Record